1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRAIN EASTER, | Case No.  1:14-cv-00732- SAB-HC |
| Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS, DIRECTING CLERK OF COURT TO ENTER JUDGMENT IN FAVOR OF RESPONDENT, AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY |
| v. | |
| FRED FOULK, | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Respondent is the Warden of High Desert State Prison, and is represented in this action by Kevin L. Quade, Esq., of the California Attorney General's Office. Both parties have consented to the jurisdiction of the Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## I.

## BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation (CDCR) pursuant to an August 24, 2011, judgment of the Superior Court of California, County of Fresno, following his conviction by jury trial on two counts of robbery, with a firearm enhancement on one count and a gang enhancement on both counts, and one count

of active participation in a criminal street gang.  (Pet., ECF No. 1).  He was sentenced to serve a term of 27 years 4 months in prison.  (LD[1] 5).

Petitioner timely filed a notice of appeal.  On August 28, 2013, the California Court of Appeal, Fifth Appellate District, affirmed the judgment.  (LD 5).  Petitioner then filed a petition for review in the California Supreme Court.  (LD 6).  On December 11, 2013, the petition was summarily denied.  (LD 7).

On May 8, 2014, Petitioner filed the instant federal petition for writ of habeas corpus in this Court.  The Petition presents the following two grounds for relief: (1) the trial court erred by not bifurcating the gang enhancements and gang count from the robbery counts and (2) his trial counsel was ineffective for not challenging the out-of-court identifications of Petitioner.  Respondent filed an answer to the petition on August 28, 2014.  Petitioner filed a traverse on December 29, 2014.

## II.

## STATEMENT OF FACTS[2]

### A.  Prosecution Evidence

*Robbery of Josh Franco (count II; defendants Williams, Thompson, Easter)*
Josh Franco, a high school teacher, placed a cell phone for sale on Craigslist, an Internet sales site. Franco listed his personal cell phone as the contact number.

At 11:00 a.m. on September 7, 2009, Franco received a call from a 408 area code. A man said he wanted to meet and look at the phone. The caller, later identified as defendant Williams, said he needed to delay the meeting because he was in church. At 1:30 p.m., Williams again called Franco and said to meet him in a church parking lot at Ashlan and Hughes.

At 3:00 p.m., Franco drove into the church's parking lot. Williams called and said he was running late. Franco waited for 15 minutes and was about to leave when he saw a black SUV driving on the

---

[1] "LD" refers to the documents lodged by Respondent with his Answer.
  "LD 5" is the opinion of the Court of Appeal in People v. Easter et al., No. 5063263, 2013 WL 4683011 (Cal. App. 2013).
[2] The Fifth District Court of Appeal's summary of the facts in its August 28, 2013, opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1).  Petitioner does not present clear and convincing evidence to the contrary; thus, the Court adopts the factual recitations set forth by the state appellate court. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009) ("We rely on the state appellate court's decision for our summary of the facts of the crime.").

adjacent street. The SUV pulled into an apartment complex. Franco believed there were more than three people in the vehicle and thought the occupants were looking at him.

About five minutes later, three African–American males walked across the street and approached Franco's truck. The three men tried to open the front passenger door, but it was locked. Franco got out of his vehicle and spoke to the men. One of the men asked to see the cell phone. Franco believed this man was the person who called him (Williams). He looked at the phone and said it was in good shape.

Within seconds, another man in the group pulled a gun and said: " 'Give us everything you got.' " Franco testified the gunman had shoulder-length dreadlocks and a goatee. He was wearing a white T-shirt, black shorts, and a black baseball cap. Williams and the third man emptied Franco's pockets in about 10 seconds. The three men then ran across the street, toward the apartment complex. Franco testified none of the men said anything about gangs during the robbery.

As we will explain, *post,* Williams and Thompson admitted their participation in this robbery. Easter denied committing the crime. Franco identified Easter as the suspect with the dreadlocks, and said he was the gunman.

Based on this offense, defendants Williams, Thompson, and Easter were charged and convicted of count II, second degree robbery of Franco. The jury found true the gang enhancement, and that Easter personally used a firearm.

### Robbery of Nicholas Flechsing (count III; defendant Williams, only)

Nicholas Flechsing, a college student, listed his Xbox video game console for sale on Craigslist. In the late morning or early afternoon of September 9, 2009, Flechsing received a call from a phone with a 408 area code. The caller, later identified as Williams, said he wanted to buy the Xbox. Flechsing told Williams to meet him at Fig Garden Village, and Williams agreed.

Flechsing rode his bicycle to Fig Garden Village and waited for 20 minutes, but the prospective buyer did not appear. Flechsing called him back, and the man said he was "taking a little bit longer than usual." Williams asked if they could meet somewhere else. They agreed to meet at the corner of Ashlan and Palm. Flechsing rode his bicycle there, but the man never showed up.

Flechsing made another call, and Williams said that he was on his way. Flechsing rode his bicycle toward the railroad tracks at Ashlan and Fruit, and waited for 5 to 10 minutes. Williams called Flechsing and said he could see him down the street, and directed Flechsing to meet him at the corner of Fruit and Swift.

Flechsing rode his bicycle to the new location. Williams was standing on the street. Williams walked up to his bicycle. Flechsing opened his backpack and showed the Xbox to Williams,

and asked for $400.

Flechsing testified that Williams started to grab his backpack. Suddenly, another man appeared and pulled a handgun from his waistband. The gunman was African–American, and his hair was shoulder-length and in dreadlocks.

Flechsing testified the gunman cocked the weapon, loaded the chamber, and pointed the gun at his chest. The gunman ordered Flechsing to give him his property. Flechsing gave Williams his backpack with the Xbox; his cell phone; and his wallet, which contained his identification and $200.

Williams and the gunman looked Flechsing "up and down," and then ran down the street. Flechsing started to ride away on his bicycle. The gunman turned around and pointed his handgun at Flechsing. Flechsing raised his hands and said, " 'I'm not going to do anything.' " Williams and the gunman ran away. Flechsing testified that neither suspect wore red or blue, and they did not say anything about a gang during the robbery.

As we will explain, *post,* Williams confessed to his involvement in this robbery. Williams was separately charged and convicted of count III, second degree robbery of Flechsing. Prior to trial, Flechsing never identified anyone as the gunman or second robbery suspect. Thompson and Easter were not charged with or convicted of committing this robbery.

### *Robbery of Garrett Gaynor (count I; defendants Williams, Thompson, Easter)*

Garrett Gaynor listed his Blackberry Gold phone for sale on Craigslist. Gaynor listed his own cell phone as the contact number.

On September 9, 2009, the same day that Flechsing was robbed, Gaynor received a call from a 408 area code from a man who wanted to buy the Blackberry. Gaynor agreed to meet the man at a particular location. The prospective buyer, later identified as Williams, repeatedly called back and changed the location. Gaynor finally told Williams that he would meet him after work. They agreed to meet at the Walgreens parking lot at Ashlan and Marks.

At 9:00 p.m., Gaynor arrived at Walgreens, parked his car, and waited. Williams called him again and asked if he was there. Gaynor said yes. Gaynor testified that three young African–American men appeared at his car. Williams asked Gaynor if he was selling a phone. Gaynor said yes. Williams was holding a white T–Mobile cell phone.

Gaynor testified the second man was wearing a red baseball cap and blue jeans. The third man had shoulder-length black hair, which was in dreadlocks with red tips.

Gaynor got out of his vehicle and met the three men at the back of his car. He showed them the Blackberry and handed it to Williams. Williams examined the Blackberry and asked if it could hold a

charge. Gaynor said he had the power plug and suggested they walk to Walgreens to charge the phone. As the group started to walk toward the store, Williams ran away with Gaynor's phone.

Gaynor testified that Williams ran toward an apartment complex. The other two men asked Gaynor where Williams went. Gaynor replied: "... I don't know, let's go get him. And as that started happening, they had taken off, as well, across the street," in the same direction as Williams.

Gaynor testified: "I proceeded to follow them, or chase them." The two men ran toward an apartment complex's side gate. They went inside, and the gate closed behind them.

Gaynor ran to the gate, but it was locked. Gaynor testified that when he got to the gate, the three men "were just all pretty much standing there and the one individual came back out and put a gun to my head...."

Gaynor testified the gunman was the man who was wearing the red baseball hat. Gaynor testified Williams and the man with red-tipped black dreadlocks were clearly visible to him. They stayed inside the apartment gate, and they stood there and watched the gunman.

Gaynor testified the gunman put the gun to his forehead and order him to turn over everything he had, and threatened to kill him. The gunman reached into Gaynor's pockets and took Gaynor's wallet and personal cell phone. Williams and the man in the dreadlocks stayed in their same location and watched. The gunman placed the gun under Gaynor's chin and threatened to kill Gaynor if he turned around.

After taking the property, the gunman ran back inside the apartment gate, joined Williams and the other man, and all three men ran away. Gaynor testified the three suspects never said anything about gangs during the robbery.

As we will explain, *post,* Gaynor identified Williams and Thompson during an infield show-up on the night of the robbery and said Thompson was the gunman. Gaynor later identified Easter from a single photograph as the third suspect with the dreadlocks. Williams and Thompson admitted their involvement in this robbery. Easter denied committing the crime.

Based on this offense, Williams, Thompson and Easter were charged and convicted of count I, second degree robbery of Gaynor. The jury found true the gang enhancement, and that Thompson personally used a firearm.

### INVESTIGATION OF GAYNOR ROBBERY
### Discovery of handgun and stolen property

Around 10:10 p.m. on September 9, 2009, several officers responded to the Walgreens parking lot and interviewed Gaynor about the robbery. Based on Gaynor's information, the officers spoke to the manager of the apartment complex on Ashlan and

Marks. The manager's information led them to a particular apartment. The tenant gave the officers permission to enter.

Defendants Thompson and Williams were in the apartment. The officers found Flechsing's stolen Xbox and videogames in the living room, and his ATM card in another room.

The officers found a large stereo speaker box in the bedroom. It contained a nine-millimeter semiautomatic handgun and a magazine. The magazine was loaded with live nine-millimeter rounds and appeared to fit the weapon.

The same stereo speaker box also contained three cell phones: Gaynor's Blackberry that he showed to Williams and he ran away with; Gaynor's personal cell phone that was taken by the gunman; and a white T–Mobile cell phone.

### Gaynor's identification of Thompson and Williams

As the investigation continued on the night of September 9, 2009, the officers drove Gaynor past two or three men standing on the street, near the apartment complex, and asked Gaynor if any of these men were the robbery suspects. Gaynor said no.

Later that night, an officer escorted Gaynor to an infield show-up of three other men: Williams, Thompson, and a third man. Easter was not present.

Gaynor immediately identified Thompson and Williams as two of the robbery suspects, and said Thompson was the gunman. Gaynor said he was 100 percent certain of the identifications. Gaynor said the third man in the show-up was not involved in the robbery.[8]

The record implies that Thompson and Williams were arrested that night.

### Williams's postarrest interview

In the early morning hours of September 10, 2009, Detective Mares interviewed Williams at the police substation. Mares advised Williams of the warnings pursuant to Miranda v. Arizona (1966) 384 U.S. 436, and Williams waived his rights. Williams was 16 years old.

Detective Mares asked Williams about the while T–Mobile cell phone found in the apartment, next to Gaynor's stolen phones. Williams said it was his cell phone and had a 408 area code. Detective Mares determined that 14 calls were placed from Williams's cell phone to Franco's cell phone. There were 10 calls placed from Williams's cell phone to Gaynor's cell phone.

During the interview, Williams admitted that he had been involved in the robberies in the church parking lot (Franco), the Walgreens parking lot (Gaynor), and the one involving the Xbox (Flechsing). Williams said that at the Walgreens robbery of Gaynor, he ran away with the victim's cell phone. He also said a gun was used.

Detective Mares testified that Williams said a gun was also used

during the robbery in the church parking lot, and two cell phones were taken from the victim (Franco). Williams said the gunman's name was "Alex" or "A–1." Detective Mares testified that Williams did not identify Easter as the gunman or a suspect in the robbery.

As for the Xbox robbery of Flechsing, Williams said that he took the victim's backpack and the Xbox, and ran away. Williams said that a gun was also used during this robbery. He did not identify the gunman.

**The cell phone picture of Easter**

Gaynor told the officers that the third robbery suspect was slightly taller, and his hair was in dreadlocks with red tips. Later on September 10, 2009, Detective Mares reviewed the photographs on Williams's T–Mobile cell phone to see if anyone matched Gaynor's description.

Mares found a photograph on Williams's cell phone, identified as exhibit No. 7, which showed two African–American males: Williams, and a man with his hair in dreadlocks with red tips. The cell phone also contained a photograph of Williams, Thompson, and the man with the red-tipped dreadlocks. Officer Robert Yeager reviewed the images and identified the man with the dreadlocks as Brian Easter, based on Yeager's prior contacts with him.

**Gaynor's identification of Easter**

On September 10, 2009, Detective Mares showed Gaynor the photograph of Williams and Easter, identified as exhibit No. 7, as it was displayed on the white T–Mobile cell phone. Mares did not reveal their identities, and he read the following admonition to Gaynor:

"... I was in possession of a phone[,] that it was not my phone. I told him that there was a photograph on this phone that I wanted him to look at. I told him that I did not know who was in the photograph, I did not know the name of the individual. And I told him that, 'It may or may not be involved in your case.' "

Detective Mares testified that Gaynor looked at the cell phone photograph and said both men were involved in the robbery. Gaynor testified that he had already identified one man on the night of the robbery, as the suspect who ran off with the Blackberry (Williams). Gaynor identified the other man in the photograph, with the red-tipped dreadlocks, as the third robbery suspect. Gaynor said the man with the dreadlocks did not have the gun.

Gaynor also said he recognized the white T–Mobile phone which contained the photograph because Williams was holding it during the robbery.

**Franco's identification of Easter**

Also on September 10, 2009, Detective Mares showed Joshua Franco the photograph of Williams and Easter, as depicted on the

white T–Mobile cell phone. Mares did not identify the men, and read the same admonition to Franco as he read to Gaynor.

Franco identified Easter as the robbery suspect with the dreadlocks, and said this man held the gun during the robbery in the church parking lot. Franco also recognized the white T–Mobile cell phone, and said the smaller suspect (Williams) used it during the robbery.

Easter was arrested on November 14, 2009.

**Photographic lineups**
Detective Mares showed Franco several "six-pack" photographic lineups, which included pictures of Williams and Thompson. Franco identified Thompson as the man who went through his pockets during the robbery. Franco did not identify Williams from the lineups.

Detective Mares never showed Franco or Gaynor any six-pack photographic lineups with Easter's picture. Mares admitted that was "not standard operating procedure." Mares confirmed he only showed a single photograph to Gaynor and Franco, Williams and Easter were in that picture, and he showed the picture to the victims after Williams had been identified.

Detective Mares testified that he looked for the suspect who Williams identified as "Alex" or "A–1," but he never found such a person.

**THE VICTIMS' TRIAL TESTIMONY AND IDENTIFICATIONS**

**Garrett Gaynor**
Garrett Gaynor testified at trial that he identified Williams and Thompson during an infield show-up on the night of the robbery. Gaynor testified the police showed him several photographs to identify the third suspect, but none of the photographs showed that person. Gaynor testified he was finally shown a photograph of a single person, and identified that person—Easter—as the third suspect with the red-tipped dreadlocks.

Gaynor testified that Detective Mares showed him a photograph of two men from a cell phone, which showed Williams and the suspect with the dreadlocks. Gaynor testified he also looked at a photograph with three individuals. When he looked at this picture, he had already identified two of the men on the night of the robbery, and he identified the third man as the suspect with the dreadlocks. Gaynor did not think that he identified Easter from the photographs which showed the suspects standing together.

Gaynor testified that exhibit No. 3 showed the three men who robbed him: the first man who spoke to him and ran off with the Blackberry (Williams), the gunman who wore the hat (Thompson), and the man with the red-tipped dreadlocks (Easter).

Also at trial, Gaynor identified Thompson as the gunman in the red

hat. Gaynor identified Easter as the suspect who wore his hair in dreadlocks with red tips, even though Easter's hair was now in a short buzz-cut. Gaynor identified Williams as the person who called him about the Blackberry, met him at his car, and ran away with the phone.

Gaynor reviewed the photograph of the nine-millimeter semiautomatic handgun found in the apartment on the night of the robbery. Gaynor identified the firearm as the weapon the gunman held at his head, which had a silver barrel and black handle. Gaynor again identified the white T–Mobile cell phone as the device which Williams was holding when they met in the parking lot.

### Josh Franco
Josh Franco testified that a few days after the robbery, the police showed him a series of photographic lineups. Franco positively identified one man as being involved in the robbery, but he was not sure if that man was the gunman.

Franco testified he also looked at a photograph of two men. He was read an admonition before he looked at this photograph, and told that it might not be the suspect. He identified one man as the gunman, and he was positive about the identification when he made it.

At trial, Franco identified defendant Thompson as one of the robbery suspects, and Thompson was not the gunman. He believed Thompson was the man he identified in the photographic lineup. Franco testified that he initially believed the man he identified in the photographic lineup (Thompson), and the man in the single photograph (Easter), were the same person, but later realized they were different people.

Franco reviewed the photograph of the handgun found in the apartment (Exhibit No. 26), and testified it was very similar to the firearm used by the gunman during the robbery. Franco recognized the silver barrel and the distinctive black handle.

### Nicholas Flechsing
Nicholas Flechsing testified that about three days after the robbery, Detective Torres showed him several photographic lineups. Flechsing identified Williams from one of the lineups (Exhibit No. 43), and said he was "absolutely positive" that Williams was the man who called him and met him on the street. Williams was not the gunman. At trial, Flechsing identified Williams as the man who met him on the street. Flechsing did not identify anyone from the photographic lineups as the gunman.

Flechsing testified the chrome-plated handgun with the black grip, which was found in the apartment, was similar to the weapon used by the gunman during the robbery.

### THE PROSECUTION'S GANG EXPERT
As to counts I and II, the robberies of Gaynor and Franco, gang

enhancements were alleged as to all three defendants (§ 186.22, subd. (b)(1)). In count IV, defendants were charged with the substantive offense of active participation in a criminal street gang (§ 186.22, subd. (a)).

Fresno Police Officer Ron Flowers testified as the prosecution's gang expert. He had been a gang investigator with the Multi–Agency Gang Enforcement Consortium (MAGEC) since 2003. He worked specifically with African–American gangs in Fresno. He had investigated close to 600 gang-related crimes. Flowers identified gangs, validated an individual's gang membership, and tracked crimes committed by gang members. Flowers had qualified as a prosecution gang expert approximately 40 times.

**The "Playboyz" Gang**
Officer Flowers testified that the "Playboyz" is an African–American criminal street gang. Flowers first became aware of the Playboyz in 2004 or 2005, when a shooting occurred which involved four victims. Flowers verified the four victims were members of the Playboyz gang. Flowers validated the existence of the Playboyz at that time.

"My partner and I were able to verify that there was a group that called themselves the Playboyz here in Fresno [C]ounty, and eventually we were able to identify members of that particular group. And that was confirmed through certain crimes that occurred in the city of Fresno."

Officer Flowers testified the Playboyz's primary colors were blue and red. Flowers acknowledged that blue was commonly claimed by the Crips, while red was claimed by the Bloods. However, Flowers explained that it was not unusual for a Fresno gang to claim both red and blue. "It is not like Bloods and Crips. We have gangs that have Bloods and Crips within themselves[,]" and "[i]t is not unusual here in Fresno to find those two groups in one gang...." Flowers testified that African–American gangs in Fresno and Los Angeles had different philosophies about colors. For the gangs in Fresno, colors were "not critical" and did not have "much of an adverse effect as it does in Los Angeles."

Officer Flowers believed there were approximately 34 to 35 members of the Playboyz in Fresno. Flowers personally knew three or more members of the gang. Flowers had conversations with members of the Playboyz about their lifestyles, loyalties, criminal gang activities, membership, signs, colors, tattoos, and graffiti. Flowers testified he reviewed about 60 police reports about the activities of the Playboyz.

The Playboyz gang used the "Playboy" emblem from Hugh Hefner's Playboy magazine as one of their symbols. The gang members also configured their hands to appear like Playboy bunny ears. Flowers had seen rivals mocking the same hand sign.

Flowers testified that the area under the Playboyz's "dominion of control" was in northwest Fresno, between Herndon and

McKinley, and Polk and Marks. The Playboyz did not claim that area as its specific turf, but "there have been a lot of events specific to this group within that area."

Flowers had also seen the word "Playboyz" used in gang writings on clothing, documents, glass, and MySpace pages. However, he had never seen any Playboyz-related graffiti in a particular area or anywhere else in Fresno. Flowers explained that some gangs are not "turf-oriented" and don't have issues over particular territories.

***Primary activities***
Officer Flowers testified that he had reviewed approximately 70 to 80 police reports involving members of the Playboyz gang. Flowers testified the primary activity of the Playboyz gang was robbery, in violation of section 211. Flowers's opinion was based on his review of approximately 12 police reports involving incidents where members of the Playboyz committed robberies, from 2006 to 2009. Flowers testified the gang had "the pattern, again the consistency of violating Penal Code [section] 211."

Flowers testified he had also investigated homicides, shootings, and firearm cases which involved members of that gang.

***Predicate offenses***
Flowers testified about several predicate offenses committed by validated members of the Playboyz gang, based on his review of certified copies of their convictions. These predicate offenses were not committed by any of the defendants. In 2005, Christopher Williams was convicted of murder (based on a vehicular homicide), transportation of narcotics for sale, and possession of cocaine base for sale. In 2006, Duane Perry was charged with second degree robbery and convicted of attempted grand theft. In 2008, Anthony Skinner was convicted of illegal possession of a weapon. In 2009, Rafael Houston pleaded guilty to illegal possession of a weapon. In 2009, Robert Tyler was convicted of illegal possession of a weapon; and in 2008, he was convicted of vehicle theft.

On cross-examination, Flowers conceded that while these predicate offenses were committed by members of the Playboyz gang, there were no gang enhancements alleged or found true in those cases. Flowers also conceded that none of the predicate offenses involved robbery charges. Flowers further testified that he did not believe anyone had been convicted of the substantive offense of active participation in a criminal street gang as a member of the Playboyz.

***Defendants' memberships in the Playboyz***
Officer Flowers testified to his opinion that Thompson, Williams, and Easter were active members of the Playboyz gang. Thompson admitted being a member of the Playboyz on six occasions in jail classification settings in January and April 2008, and January, February, and September 2009. On January 5, 2009, Thompson admitted his gang affiliation to Fresno homicide detectives.

Thompson had been documented as associating with Playboyz gang members in June 2003, August 2003, November 2004, and May 2007. Thompson was arrested with other members of the Playboyz on July 4, 2004, November 6, 2004, and January 23, 2009.

Officer Flowers classified Thompson as an active participant in the gang based on the crimes he had committed, and his regular association with other active members of the gang. Flowers identified Thompson in a photograph which showed him making the Playboyz hand sign, placing his fingers like rabbit ears. Thompson had a tattoo of the Playboy bunny on his left arm, with the word "Playboyz" written underneath it.

Officer Flowers testified that Easter was arrested on February 14, 2006, with Tyrone Williams, a member of the Playboyz. On May 24, 2008, Easter was documented as associating during a shooting incident with Tyrone Williams, Anthony Silva and Maharie Kidan, who were also members of the Playboyz. On July 10, 2008, Easter was arrested with Robert Lee and Maharie Kidan. On January 3, 2009, Easter was with Tyrone Williams when he was contacted about being present during a homicide. On April 8, 2009, Maharie Kidan was arrested, and he claimed Easter provided him with a weapon. On May 28, 2009, Easter was contacted during a traffic stop with Anthony Skinner, a member of the Playboyz.

Flowers testified that Easter's nickname was "Kook." Flowers classified Easter as an active participant in the Playboyz based on his behavior and nature and frequency of his contacts.

Officer Flowers testified that on January 3, 2009, Williams was identified as a member of the Playboyz by homicide detective Todd Frazier. On April 27, and July 19, 2009, Williams was documented as associating with, respectively, Tyrone Williams and Jason Bryant, members of the gang. On June 7, and September 10, 2009, Williams admitted to juvenile probation officers that he was a member of the Playboyz gang.

Flowers testified Williams was an active participant in the Playboyz gang because "his behavior is more than nominal, as we outlined the many contacts through law enforcement and the related offenses during those investigations."

***Williams's cell phone and the videos***
Williams's cell phone contained a contact list. Officer Flowers testified the names included "PB Kook," "PB Crane," "PB Gunne," and "PBJKIDDDDD." Flowers believed "PB" was an acronym for "Playboyz."

There were also two videos on the cell phone. Both videos were played for the jury in this case.

One video showed Easter, Thompson, Williams, and another man in the bathroom of the same apartment which was searched on the night of the robbery. Thompson was holding a semiautomatic

handgun, which was similar to the weapon found in the apartment and identified by the victims. The "bathroom" video was recorded on September 4, 2009.

Officer Flowers testified that defendants' conduct on the "bathroom" video supported his opinion that they were members of the Playboyz, based on their dialogue, hand signs, displays of tattoos and the gun, and discussion of specific rivals. The defendants mentioned "The Mob, Klette Mob, also known as the Laidlaw Boys" as a rival gang. Terrance Bryant was the fourth man in the video, and he displayed a red tattoo of the letter "P" on his chest.

The second video showed several young men in a parking lot. It was recorded on September 5, 2009. Officer Flowers testified the "parking lot" video showed Thompson, Williams, and other young African–American males. They were announcing "Playboyz," and displaying Playboyz hand signs. Officer Flowers did not see Easter in that video.

Flowers testified the expressions and statements made by defendants in the videos clearly promoted the Playboyz gang. "Judging from the content and the dialogue and the expressions made, I would be under the impression that these individuals had done something and were warning others and claiming their gang membership openly."

***The charged offenses***
Officer Flowers conceded that a gang member may commit a crime or a robbery for personal reasons and not for the benefit of the gang. Based on a series of similar hypothetical questions, Flowers testified to his opinion that the robberies were committed in association with a criminal street gang. All of the perpetrators were members of the same gang, they committed the crimes in concert, and they conspired together to commit the robberies.
While the participants did not say the gang's name during the robberies, the crimes benefitted the gang by building its reputation and each defendant's notoriety. The robbery proceeds also benefitted the gang financially by enabling the gang members to buy guns, and increased their individual prestige and the gang's prestige.

Officer Flowers further explained that gang members gain respect through committing acts of violence. These actions allow the gang members to instill fear in the community and among their rivals. "Other members see it, other members want to be a part of it. They want to repeat. They want to join. That's the dangerous element about group participation."

///
///
///

13

## B. DEFENSE EVIDENCE

Thompson and Easter testified at trial; Williams did not testify.

### Thompson's trial testimony

Thompson, who was 23 years old, admitted he had prior convictions for felony statutory rape and petty theft in 2007. He obtained the "Playboyz" tattoo on his arm when he was 14 years old to show his cousin that he liked girls.

Thompson testified that he was depicted in the "bathroom" video, which was filmed in September 2009 at his grandmother's apartment. Easter, Williams, and Terrance Bryant were also in the video. Thompson admitted that he held a gun in the video. Thompson testified that he was in a "bad place" in his life at that time. He was "... doing Ecstasy, smoking all kinds of weed, you know, just being stupid." Thompson said he was in the parking lot video with his cousins. Williams filmed the video. Easter was not there.

Thompson admitted that he was present during the Gaynor and Franco robberies, and Williams was also there.

Thompson testified the robberies were not committed for the benefit of the Playboyz or any gang, but because he needed money for his rent and he did not have a job. Thompson testified he was not present during the Flechsing robbery.

Thompson testified he robbed Gaynor at gunpoint and used the nine-millimeter handgun which was found in his grandmother's apartment. Williams and an unknown third man were also present. He said that Williams made the telephone calls to set up the robbery.

Thompson testified that he was present when Franco was robbed. Thompson was not the gunman, but the same gun was used from the Gaynor robbery. Thompson went through Franco's pockets during the robbery. Williams and an unknown third man were present during the robbery.

Thompson initially testified that the unknown suspect who was present during the Gaynor robbery was not the same unknown man who was present during the Franco robbery. As to the Gaynor robbery suspect, Thompson testified he met this man in the apartment complex, and the robbery was this man's idea.

Thompson testified he feared for his life if he identified the third suspect in the Franco robbery. Thompson knew this man from the apartment complex, and this man always wore blue and said he was a Crip. Thompson admitted he committed the Franco robbery in association with a Crip.

During cross-examination, Thompson's description of the third suspect began to change, and he admitted that the same man was the third suspect for both the Franco and Gaynor robberies.

Thompson testified this man was a member of the Crips, and he knew the man was a Crip when they committed both robberies.

Thompson testified that he knew about the Playboyz, but insisted it was not a street gang: "It's a family.... [M]ost of the people that are in it are all family, all cousins and brothers." "To us it is not a gang." Thompson and some of his cousins referred to themselves as Playboyz, but he meant that he was a "player" with the girls. Thompson testified that the Playboyz partied and went to clubs when they were together.

On further cross-examination, Thompson admitted he was a member of the Playboyz and there were about 20 members, including many people in his family. Thompson knew Christopher Williams, Anthony Skinner, Christopher Williams, Jason Bryant, Tyrone Williams, and Rafael Houston, and also knew they were members of the Playboyz.

Thompson testified that members of the Playboyz did not get along with the "Northside" and "Murder Squad" gangs because they did not want to join those two gangs. Thompson repeatedly denied the Playboyz was a criminal street gang, that the members committed crimes, or that its primary purpose was to commit robberies. Thompson admitted that he claimed membership in the Playboy Crips during the jail classification interviews. He did so to avoid being jumped in jail. He said there was no such group as the Playboy Crips.

Thompson testified that Williams was a member of the Playboyz. Thompson knew Williams was a member when they committed the robberies. Thompson testified that Easter was not a member of the Playboyz, and he was not present during the Gaynor and Franco robberies.

On further questioning, Thompson testified he was not afraid to implicate Williams because he knew that Williams already talked to the police and said he was involved in the robberies. Thompson testified he knew that Easter had not implicated himself in the robberies. Thompson testified he was afraid to implicate Easter as the third suspect because Easter had not implicated himself. Thompson testified he was related to Easter, and Thompson had known Easter for his entire life. He did not want Easter to get into trouble, but denied that he would lie for Easter.

### Easter's trial testimony

Easter testified he had known Thompson since elementary school. He did not know Thompson was a member of the Playboyz until he heard Thompson's trial testimony. He had known Williams since high school, and did not know whether he was a member of the Playboyz. Easter testified the Playboyz were people who went to "dance parties, and like going out to the clubs and stuff...."

Easter admitted that he was in the bathroom video with Thompson and Williams, and that he saw the gun that was shown in the video.

Easter testified the fourth person in the bathroom video was known as "Gunne," and Easter knew he had a "P" tattooed on his chest. Easter also knew that Thompson had a tattoo of a Playboy bunny on his arm, but these tattoos meant nothing to him. Easter testified he was present when Williams spelled out the word "Playboyz" in the bathroom video. Williams testified he did not recall Williams talking about the Bloods and the Crips during the bathroom video, and the words meant nothing to him. Easter was not present during the parking lot video.

Easter testified he had never been charged or convicted of a crime. Easter admitted he vandalized a shopping cart with Tyrone Williams in February 2006. He was taken to juvenile hall and released. He was arrested on September 10, 2008, for illegally discharging a firearm, and released the same day.

Easter admitted he was present when a homicide occurred at a party in January 2009. Easter denied that he gave a gun to Maharie Kidan on April 8, 2009. Easter was with Anthony Skinner during a traffic stop on May 28, 2009. Skinner was a close family friend, but Easter did not know if he was a member of the Playboyz.

Easter testified he was not involved in the Franco or Gaynor robberies. He was not a member of any gang, and he never committed any crimes for the benefit of a gang. Easter never called himself a member of the Playboyz, but he knew some people who used that name. Easter admitted he was known by the nickname of "Kook."

Easter testified that in the fall of 2009, he was employed by a home care agency, and cared for his disabled mother under a program sponsored by the state. He lived with his mother, and he also shared an apartment with the mother of his child.

Easter testified that at the time of the Franco robbery, he was working for the home care agency and providing services to his mother. On the night of the Gaynor robbery, he was staying with his daughter and the child's mother, at their residence near Clinton and Brawley. He cut his hair sometime after the bathroom video was made in September 2009, and before he was arrested on November 14, 2009.

(LD 5).

## III.

## DISCUSSION

**A.    Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States.   28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); <u>Williams v.</u>

_Taylor_, 529 U.S. 362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises out of Fresno County Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  _Lindh v. Murphy_, 521 U.S. 320 (1997); _Jeffries v. Wood_, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

**B.     Standard of Review**

Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); _Harrington v. Richter_, 562 U.S. 86, 131 S.Ct 770, 783-84, 178 L.Ed.2d 624 (2011); _Lockyer v. Andrade_, 538 U.S. 63, 70-71 (2003); _Williams_, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'"  _Lockyer_, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision."  _Williams_, 592 U.S. at 412.  "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  _Id_.  In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in

1  . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of
2  review under AEDPA.  Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v.
3  Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v.
4  Musladin, 549 U.S. 70 (2006).  If no clearly established Federal law exists, the inquiry is at an
5  end and the Court must defer to the state court's decision.  Carey, 549 U.S. 70; Wright, 552 U.S.
6  at 126; Moses, 555 F.3d at 760.

7       If the Court determines there is governing clearly established Federal law, the Court must
8  then consider whether the state court's decision was "contrary to, or involved an unreasonable
9  application of," [the] clearly established Federal law."  Lockyer, 538 U.S. at 72 (quoting 28
10  U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant the writ
11  if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a
12  question of law or if the state court decides a case differently than [the] Court has on a set of
13  materially indistinguishable facts."  Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at
14  72.  "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite
15  in character or nature,' or 'mutually opposed.'"  Williams, 529 U.S. at 405 (quoting Webster's
16  Third New International Dictionary 495 (1976)).  "A state-court decision will certainly be
17  contrary to [Supreme Court] clearly established precedent if the state court applies a rule that
18  contradicts the governing law set forth in [Supreme Court] cases."  Id.  If the state court decision
19  is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed
20  under the pre-AEDPA de novo standard.  Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en
21  banc).

22       "Under the 'reasonable application clause,' a federal habeas court may grant the writ if
23  the state court identifies the correct governing legal principle from [the] Court's decisions but
24  unreasonably applies that principle to the facts of the prisoner's case."  Williams, 529 U.S. at
25  413.  "[A] federal court may not issue the writ simply because the court concludes in its
26  independent judgment that the relevant state court decision applied clearly established federal
27  law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411;
28  see also Lockyer, 538 U.S. at 75-76.  The writ may issue only "where there is no possibility

fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Harrington, 131 S.Ct. at 784.  In other words, so long as fairminded jurists could disagree on the correctness of the state courts decision, the decision cannot be considered unreasonable.   Id.   If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict.  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent.  Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable.  See LaJoie v. Thompson, 217 F.3d 663, 669 (9th Cir. 2000); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999).

The AEDPA requires considerable deference to the state courts.  "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," and "evidence introduced in federal court has no bearing on 2254(d)(1) review." Cullen v. Pinholster, __ U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011).  "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(e)(1)).  However, a state court factual finding is not entitled to deference if the relevant state court record is unavailable for the federal court to review.  Townsend v. Sain, 372 U.S. 293, 319 (1963), overruled by, Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).

**C.     Review of Claims**

1. Ineffective assistance of counsel

Petitioner argues that he received ineffective assistance of counsel, because his trial counsel did not challenge the out-of-court identification of him by two of the robbery victims, Gaynor and Franco.  This claim was presented on direct appeal to the Fifth District Court of Appeal and it was denied in a reasoned decision.  Petitioner then presented this claim in a

petition for review to the California Supreme Court. The California Supreme Court summarily denied the petition. Federal courts review the last reasoned state court opinion. Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991). Therefore, the Court must review the opinion of the Fifth District Court of Appeal. In rejecting Petitioner's claim, the appellate court stated as follows:

**The victims' identifications of Easter**
As set forth in the factual statement, Gaynor and Franco identified Easter as one of the robbery suspects after they separately looked at a single photograph which showed Williams and Easter standing together.

Easter contends that his defense attorney was prejudicially ineffective for failing to file a pretrial motion to exclude the victims' identifications based on that single photograph. Easter contends the photographic identification process was unduly suggestive and violated his due process rights because the picture showed Easter with as one of the suspects.

**A. Background**
Easter did not file any pretrial motions to argue that the identifications made by Gaynor and Franco, from the single photograph which showed Easter and Williams, violated his due process rights or was the result of unduly suggestive and unreliable procedures.

After Easter was convicted, he filed a motion for new trial and argued the court should have suppressed the identification evidence because the single photographic show-up was inherently suggestive and unreliable since it showed Easter and Williams together, the victims never looked at photographic lineups for the third suspect with the dreadlocks, and Franco did not identify Easter in court.

The People replied that Easter had waived this issue since he never objected to or moved to exclude the identification evidence. In the alternative, the People asserted the identification procedure for Easter was reliable and not suggestive.

The trial court denied Easter's motion for new trial and found the identification procedure for Easter was not unduly suggestive, and it did not cause Easter to "stand out." The court believed the victims looked at a photograph which only showed Easter, and the picture did not show Thompson or Williams.[31]

> FN31. As we will explain, post, the court's statement about the nature of the photograph used to identify Easter conflicts with the trial evidence. Detective Mares testified that Gaynor and Franco separately identified Easter when they looked at the photograph identified as exhibit No. 7, which showed both Easter and Williams. When Gaynor testified, he thought he identified Easter after looking at a

photograph which only showed one person, but agreed that he also looked at exhibit No. 7.

The court held there was nothing in that photograph that suggested Easter stood out compared to the other live witnesses and photographs that were viewed by the victims.   The victims "described very accurately" Easter's hairstyle, "even to the point of the dreadlock hairstyle having red tips."   While there were inaccuracies in Franco's description of the suspect's height and facial hair, Franco immediately identified Easter from the photograph and said he was the gunman.

> "[C]onsidering all the circumstances under which this identification took place, the Court is not satisfied that the … procedure was unduly suggestive. It was not. These … victims in the case had the opportunity to view others live and in photographs and did not select those individuals. They selected the person that they believed based upon … what they went through to be the person who was involved."

The court also found that both victims received appropriate admonitions before they looked at the photograph, and the identifications were close in time to the robberies.

## B.  Suggestiveness

We begin with the well-settled principles about pretrial identification procedures, which violate due process if such procedures are so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. (*People v. Sanders* (1990) 51 Cal.3d 471, 508.)  " 'The issue of constitutional reliability depends on (1) whether the identification procedure was unduly suggestive and unnecessary [citation]; and if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation [citation].  If, and only if, the answer to the first question is yes and the answer to the second is no, is the identification constitutionally unreliable.' [Citation.]   In other words, '[i]f we find that a challenged procedure is not impermissibly suggestive, our inquiry into the due process claim ends.' [Citation.]" (*People v. Ochoa* (1998) 19 Cal.4th 353, 412 (Ochoa).)

"To determine whether a procedure is unduly suggestive, we ask 'whether anything caused defendant to "stand out" from the others in a way that would suggest the witness should select him.' [Citations.]"  (*People v. Yeoman* (2003) 31 Cal.4th 93, 124.) "[F]or a witness identification procedure to violate the due process clauses, the state must, at the threshold, improperly suggest something to the witness – i.e., it must, wittingly or unwittingly, initiate an unduly suggestive procedure."  (*Ochoa, supra,* 19

Cal.4th at p. 413.)   "A procedure is unfair which suggests in advance of identification by the witness the identity of the person suspected by the police." (*People v. Slutts* (1968) 259 Cal.App.2d 886, 891 [photographic lineup violated due process where child shown several pictures, but only one had beard drawn on it].)

The defendant bears the burden of demonstrating that the identification procedure was suggestive, unreliable, and so unfair that it violated his due process rights. (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1222; *People v. Sanders*, supra, 51 Cal.3d at p 508.) The defendant must show "unfairness as a demonstrable reality, not just speculation." (*People v. DeSantis*, *supra*, 2 Cal.4th at p. 1222.) If the defendant raised and preserved the issue, we independently review the trial court's ruling that a pretrial identification procedure was not unduly suggestive. (*People v. Avila* (2009) 46 Cal.4th 680, 698.)

**C.  Single-person photographic identifications**
A single-person photographic show-up is not inherently unfair or impermissibly suggestive.  (*Ochoa*, supra, 19 Cal.4th at pp. 413, 425-426; *People v. Clark* (1992) 3 Cal.4th 41, 136, overruled on other grounds in *People v. Pearson* (2013) 56 Cal.4th 393, 462; *People v. Floyd* (1970) 1 Cal.3d 694, 714, overruled on other grounds in *People v. Wheeler* (1978) 22 Cal.3d 258, 287, fn. 36.) "Showing the witnesses a single photo of the defendant is no more impermissibly suggestive than an in-court identification with the defendant personally sitting at the defense counsel table in the courtroom. [Citations.]" (*People v. Yonko* (1987) 196 Cal.App.3d 1005, 1008-1009, original italics.)

However, numerous cases have also "condemned the use of a single photo identification procedure." (People v. Contreras (1993) 17 Cal.App.4th 813, 820.) Single person show-up procedures are considered unfair when they are not neutral, and unnecessarily suggest to the witness in advance the identity of the person suspected by the police. (*People v. Yeoman*, supra, 31 Cal.4th at pp. 123-124; *Ochoa*, *supra*, 19 Cal.4th at pp. 412-413; *People v. Slutts*, *supra*, 259 Cal.App.2d at p. 891.) We must look to the totality of the circumstances of the identification procedure.  If we find the challenged procedure is not impermissibly suggestive, the due process claim fails.  (*Ochoa*, *supra*, 19 Cal.4th at p. 412.)

**D.  Analysis**
Defendant Easter did not file a pretrial motion to challenge the photographic identification procedure.  He filed a posttrial motion for new trial based on the inherent suggestiveness of the identification procedure, and the trial court denied that motion.  On appeal, however, he has not challenged the court's denial of his new trial motion.

Defendant Easter's failure to file a timely objection to alleged suggestiveness of the identification procedure results in waiver of that issue.  (*People v. Cunningham* (2001) 25 Cal.4th 926, 989.) Easter acknowledges this problem and raises the alternate contention that his defense attorney was prejudicially ineffective

for failing to file a pretrial motion to challenge the single photographic show-up which led to Franco and Gaynor identifying him as the third robbery suspect.

"To establish ineffective assistance, defendant bears the burden of showing, first, that counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms. Second, a defendant must establish that, absent counsel's error, it is reasonably probable that the verdict would have been more favorable to him. [Citations.]" (*People v. Hawkins* (1995) 10 Cal.4th 920, 940, overruled on other grounds in *People v. Lasko* (2000) 23 Cal.4th 101, 110 and *People v. Blakeley* (2000) 23 Cal.4th 82, 89.)

We first note that while Easter's attorney did not file a pretrial motion to exclude the identifications, he was not oblivious to this issue. He extensively cross-examined Detective Mares on how and why he only used a single photograph for the identification of Easter, and about his failure to use a photographic lineup. When Franco testified, Easter's attorney sought to undermine the accuracy of Franco's identification of Easter, and Franco became confused as to whether he had identified Thompson and/or Easter. Finally, Easter's attorney used closing argument to attack the reliability of the Gaynor and Franco identifications of Easter based on inconsistencies in Franco's description of the third suspect, Franco's trial confusion, and the use of a photograph with both Williams and Easter. Easter's attorney urged the jury to review the instruction about the factors to evaluate eyewitness identifications, and argued the victims' identifications of Easter were not reliable and should be rejected. The jury was fully and correctly instructed by CALCRIM No. 315 on the factors to evaluate eyewitness identification testimony.

In any event, "[i]f a defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim on that ground without determining whether counsel's performance was deficient. [Citation.]" (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1008, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Thus, the ultimate question before this court is whether the failure of Easter's attorney to file a pretrial challenge to the identification procedure was prejudicial, i.e., whether there is a reasonable probability the result would have been different if such a motion had been made.

**1. Suggestiveness**

We believe the answer to that question is no for several reasons. First, the use of a single photograph is not inherently unfair or impermissibly suggestive, and the fact single photograph is not inherently unfair or impermissibly suggestive, and the fact officers used that procedure did not violate due process by itself.

Second, there is no evidence the investigating officers engaged in any conduct which improperly suggested to Gaynor and/or Franco that the officers believed Easter was one of the suspects. Indeed, Gaynor had looked at numerous suspects before he identified

Easter. Just after the robbery, police officers drove Gaynor past two or three men standing on the street near the apartment complex and asked Gaynor if any of these men were the robbery suspects. Gaynor said no. Later that night, Gaynor was taken to an infield show-up of three men. He immediately identified Williams and Thompson as two of the robbers, but did not identify the third man as a suspect.

When Detective Mares showed Gaynor and Franco the photograph of Easter from Williams's cell phone (on separate occasions), Mares read admonitions to them that the photograph may or may not show someone involved in his case. Franco also looked at different photographic lineups. Thus, the officers' efforts to identify all three suspects were not limited to showing the single photograph of Easter to the robbery victims.

Defendant Easter argues the single photograph shown to the victims was inherently suggestive because it depicted Easter and Williams together, and Williams had already been identified as one of the robbery suspects. The People contend that Easter was the only person in the photograph that was shown to the robbery victims. In support of this contention, the People cite to the trial court's findings when it denied defendant's new trial motion.

When the trial court made these findings, however, it acknowledged that it was doing so from memory. The court's memory appears inconsistent with the trial evidence. Detective Mares testified that he showed the photograph marked exhibit No. 7 to Franco and Gaynor, the photograph had been found on Williams's cell phone, and it depicted two African-American males: Easter, who had red-tipped dreadlocks, and Williams.FN32

> FN32. The court may have relied on Gaynor's testimony when it made this finding. Gaynor testified he identified Easter from a photograph which showed a single person, and he thought he looked at a photograph other than exhibit No. 7 when he made the identification. Gaynor also testified that at some point, he looked at exhibit No. 7 and recognized both Williams and Easter in the picture.

We note that the mere fact that Williams and Easter were in the single photograph together does not mean the identification procedures were suggestive. On the night of the robbery, Gaynor was taken to an infield show-up and asked to look at three men: Williams, Thompson, and a third man. Gaynor identified Williams and Thompson as two of the robbery suspects, and did not identify the third man. Thus, the presence of another man with two of the identified suspects did not influence Gaynor to identify that man, or cause him to hesitate about identifying the other two suspects. As for Franco, he looked at photographic lineups, which contained pictures of Thompson and Williams. He identified Thompson as the man who went through his pockets, but he failed to identify Williams. Thus, the record suggests that Franco looked at the photograph without having already identified Williams.

24

## 2. Reliability

In any event, even if it was suggestive to show the victims a single photograph, the identifications were reliable under the totality of the circumstances, considering the victims' opportunity to view the perpetrator at the time of the offense, the accuracy of their descriptions, the level of certainty they demonstrated at the time of the identifications, and the lapse of time between the robberies and the identifications. (*People v. Kennedy* (2005) 36 Cal.4th 595, 608 (Kennedy), disapproved on other ground in *People v. Williams* (2010) 49 Cal.4th 405, 459.) Both Gaynor and Franco were in close proximity with all three robbers, they consistently described the third man's red-tipped dreadlocks, Gaynor made his identification less than 24 hours after he was robbed, and Franco's identification was within two to three days after he was robbed. Franco and Gaynor both said they were certain of their identifications at the time they viewed the photograph, and Franco further identified Easter as the gunman in his robbery. While Franco and Gaynor may have been shaken by being victims of an armed robbery, they were sufficiently observant to also identify the white T- Mobile cell phone as the device which Williams held during the robberies, and describe the firearm consistent with the weapon which was found in the apartment with the stolen cell phones.

Defendant Easter argues the victims' identifications were not reliable because they gave inconsistent descriptions of the third suspect's precise height, and whether he had gold or silver teeth. Easter also points out that during his trial testimony, Franco confused Easter with Thompson, and he did not identify Easter at trial as the third suspect.

There are two cases which dealt with similar issues about suggestiveness and reliability. In Kennedy, supra, 36 Cal.4th 595, a seemingly suggestive identification process was found to be reliable under similar circumstances. In that case, a witness to a murder at a rest stop described the perpetrator to police and attempted to aid in preparing a composite sketch of the man. (*Id.* at p. 603.) She said the perpetrator had no facial hair. (*Ibid.*) When an arrest was made, the witness saw a newspaper photograph of the arrestee, the defendant, and expressed her concern to police because of the defendant's eyes and beard. (*Id.* at pp. 605, 610.) A detective showed her a picture of the defendant without a shirt, which revealed his tattoos of a swastika, a gun, and the name of his gang. The witness could not identify the defendant because his eyes were downcast in the picture.

When shown a videotape of the arrest, however, the witness saw the defendant's eyes, immediately identified him, and expressed disbelief for failing to notice his beard. The witness later positively identified the defendant at trial. (*Ibid.*) The trial court found the identification procedure was not unduly suggestive.

Kennedy held the identification evidence "was admissible as reliable under the totality of circumstances ...." (*Kennedy*, *supra*, 36 Cal.4th at p. 610.) Kennedy found that the facts that the witness

had inaccurately described the suspect to police, and did not recognize him in the newspaper photograph, were outweighed by her proximity to the perpetrator, she had looked at him for 30 to 60 seconds, only three weeks passed between the crime and the identification, and the certainty of her later identifications upon seeing the video and in court. (*Id.* at pp. 610-611.)

In *People v. Contreras*, *supra*, 17 Cal.App.4th 813, the court held that a prosecutor's act of showing a single photograph of the defendant to a victim witness was suggestive, but the identification did not violate due process. (*Id.* at p. 820.) The victim had been told there were two suspects in custody. The victim personally knew one of his attackers, and he knew the police wanted him to identify the other one. Contreras held the showing of the single photograph necessarily suggested to the witness that it depicted the other attacker. (*Ibid.*)

However, Contreras further held that the trial court's decision to allow the identification evidence did not violate due process. (*Contreras*, *supra*, 17 Cal.App.4th at p. 823.) The jury was made fully aware of the witness's failure to select the defendant from photographic lineups prior to the identification at the preliminary hearing. (*Ibid.*) The jury saw the single photograph of the defendant and was able to assess its clarity. The jury was also able to determine whether the witness should have been able to identify the defendant given the circumstances of the attack, it was instructed on the factors bearing upon the accuracy of an eyewitness's identification, and defense counsel strenuously argued that the identification was not credible. At that point, the identification issue became "largely one of credibility," which was a question for the jury. (*Id.* at pp. 823-824.)

In this case, as in Kennedy and Contreras, the jury was well aware of the single photograph identification procedure. Easter's attorney ably developed the evidence which showed the procedures used to identify Easter, the nature of the photograph used for that identification, Franco's confusion at trial between Easter and Thompson, and the possible differences between the victims' descriptions of the third suspect and Easter's appearance. The jury was also fully instructed on the factors to evaluate eyewitness identification testimony, and defense counsel urged the jury to discount the victims' identifications of Easter as inaccurate.

Easter cites *People v. Nation* (1980) 26 Cal.3d 169, as an example where a defense attorney's failure to challenge the identification procedure was prejudicial. The instant case, however, is not similar to Nation. In Nation, the defendant was charged with threatening and molesting children. Two weeks after the event, the children viewed photographs at the police station. One child selected the defendant's mug shot. She told the other children that she had identified the assailant, and, after some discussion, the other children agreed. An officer gave the mug shot to the children, so they could take it home and show other possible witnesses. Almost four months later, the children failed to identify the defendant in a live lineup, and they identified another individual. They were told

they had selected the "wrong" man.  (Id. at p. 174.)

Nation held that the photographic identification evidence was so extraordinarily suggestive that it was doubtful that the prosecutor could have submitted it over the timely objection of trial counsel. Nation further held defense counsel's failure to object to the identification procedure deprived defendant of constitutionally adequate assistance.  (*People v. Nation*, *supra*, 26 Cal.3d at pp. 174, 179-181.)  As illustrated, ante, such suggestive and unreliable circumstances are completely absent from this case.

### 3.  Prejudice

Finally, given the nature of defendant's ineffective assistance claim, the record demonstrates another reason that it is not reasonably probable that a more favorable result would have occurred.  Defendant Easter contends defense counsel's conduct was prejudicial because there was no other evidence which implicated him in the robberies, aside from the victims' identification testimony, and Thompson's trial testimony which exonerated him.

The entirety of Thompson's trial testimony cannot be characterized as exonerating Easter.  Thompson testified that he committed two of the robberies with Williams, and Easter was not the third person. Thompson initially claimed that the third suspect in the Franco robbery was not the same person who committed the Gaynor robbery. He said he met both these men at the apartment complex. One man was associated with the Crips; he did not really know these men; and he feared for his life if he identified them.

On cross-examination, however, Thompson's description of two different men as the third suspect began to break down.  Thompson admitted that the same man committed both the Gaynor and Franco robberies, but still refused to identify him.  When asked why he was willing to implicate Williams, Thompson replied that he knew Williams had already talked to the police and admitted he committed the robberies.

The most crucial part of Thompson's testimony was his admission that he knew that Easter had not implicated himself in any of the robberies.  Thompson testified he was afraid to implicate Easter as the third suspect because Easter had not implicated himself.

> "Q So isn't it true that you're afraid that if you were to say that Brian Easter was the person, the third party involved in this robbery that you would be implicating him where he hadn't previously done so?

> "[EASTER'S ATTORNEY]: I'm going to object to the form of the question as argumentative, compound, and vague.

> "THE COURT:        Overruled.

"[THOMPSON]:       Can you say it one more time for me?

"(Thereupon the question was read by the court reporter.)

"[THOMPSON]:       Yes."

Thompson insisted that was not the reason that he said the third suspect was someone other than Easter.  However, Thompson also testified he was related to Easter. Thompson had known Easter for his entire life, and he did not want Easter to get into trouble. Thompson denied that he would lie for Easter.

While Thompson may have claimed Easter was not the third suspect, and he would not lie for Easter, he conceded he was afraid to implicate someone who had not already confessed to the crimes. Thompson's testimony thus raised the extremely strong inference that Easter was the third robbery suspect.

We thus conclude that based on the entirety of the record, defense counsel's failure to challenge the pretrial identification of Easter was not prejudicial because the victims' identifications were otherwise reliable, and any erroneous admission of their identifications was harmless given Thompson's trial testimony.

(LD 5).

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors.  See Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984).  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.  Strickland, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances.  Id. at 688; Harrington v. Richter, 131 S.Ct. at 788 ("The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom.).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges a strong presumption that counsel's conduct falls within the wide range of

1    reasonable professional assistance.  Strickland, 466 U.S. at 687; Sanders v. Ratelle, 21 F.3d

2    1446, 1456 (9th Cir. 1994).

3        Second, the petitioner must show that counsel's errors were so egregious as to deprive

4    defendant of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688.  The court

5    must also evaluate whether the entire trial was fundamentally unfair or unreliable because of

6    counsel's ineffectiveness.  Id.; United States v. Quintero-Barraza, 78 F.3d 1344, 1345 (9th Cir.

7    1995); United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).  More precisely, petitioner

8    must show that (1) his attorney's performance was unreasonable under prevailing professional

9    norms, and, unless prejudice is presumed, that (2) there is a reasonable probability that, but for

10   counsel's unprofessional errors, the result would have been different.  It is not enough "'to show

11   that the errors had some conceivable effect on the outcome of the proceeding.'"  Richter, 131

12   S.Ct. at 787 (internal citation omitted).  Accordingly, the question "is not whether a federal court

13   believes the state court's determination under the Strickland standard was incorrect but whether

14   that determination was unreasonable-a substantially higher threshold."  Schriro v. Landrigan, 550

15   U.S. 465, 473 (2007).  In effect, the AEDPA standard is "doubly deferential" because it requires

16   that it be shown not only that the state court determination was erroneous, but also that it was

17   objectively unreasonable.  Yarborough v. Gentry, 540 U.S. 1, 5 (2003).  Moreover, because the

18   Strickland standard is a general standard, a state court has even more latitude to reasonably

19   determine that a defendant has not satisfied that standard.  See Yarborough v. Alvarado, 541 U.S.

20   652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering

21   the rule's specificity.  The more general the rule, the more leeway courts have in reaching

22   outcomes in case-by-case determinations.").

23       Here, the Court of Appeal applied the Strickland standard for ineffective assistance of

24   counsel, which was the appropriate clearly established federal law.  This Court will determine

25   whether the Court of Appeal reasonably concluded that Petitioner's ineffective assistance of

26   counsel claim failed on both the performance and prejudice prongs of Strickland for a motion

27   challenging the out-of-court identifications of Petitioner.

28       The California Court of Appeal determined that the out-of-court identifications of

1    Petitioner by Gaynor and Franco were neither suggestive nor unreliable, and therefore, any

2    challenge to the out-of-court identifications would have been unsuccessful.  A pretrial motion to

3    suppress an out-of-court identification looks at whether the identification procedure used by the

4    police was so suggestive "as to give rise to a very substantial likelihood of irreparable

5    misidentification."  Simmons v. United States, 390 U.S. 377, 384 (1968); People v. Cunningham,

6    25 Cal.4th 926, 989 (2001).  Even if the identification was suggestive, it can still be reliable

7    under the totality of the circumstances, including the witness's opportunity to view the criminal

8    and the witness's degree of attention at the time of the crime, the accuracy of the witness's prior

9    descriptions of the suspect, the level of certainty at the identification, and the time between the

10   crime and the identification.  See Neil v. Biggers, 409 U.S. 188, 199 (1972); Manson v.

11   Brathwaite, 432 U.S. 98 (1977).

12          It was reasonable for the Court of Appeal to conclude that the single-person photographic

13   identifications of Petitioner by Gaynor and Franco were not suggestive.  Single person show-up

14   procedures that are not neutral and unnecessarily suggest to the witness in advance the identity of

15   the person suspected by the police will be deemed impermissibly suggestive.  People v. Ochoa,

16   19 Cal.4th 353, 412-13 (1998).  The investigating officers showed a number of photographs to

17   Gaynor and Franco at separate times.  There was no evidence that the officers conducting the

18   photographic identification acted in a way that would have suggested to Gaynor or Franco that

19   Petitioner was a suspect or that they should select Petitioner from the photographs.  Although the

20   photograph of Petitioner that was used in the single-person photographic identification procedure

21   also had co-defendant Williams in it, there is no evidence to suggest that either Gaynor or Franco

22   selected Petitioner based on Williams being in the photograph.  Franco identified Petitioner prior

23   to any indication that he recognized Williams as a suspect.  Although it is unknown if Gaynor

24   recognized Williams as a suspect at the time he made the identification, there is no evidence that

25   Gaynor would have identified one suspect solely because he was seen with another suspect.

26   Gaynor had identified Williams and Thompson during a show-up of three men the night of the

27   crime, and Gaynor did not identify the third man as a participant in the robbery.  Therefore,

28   Franco and Gaynor's identifications of Williams and Thompson were not influenced by the

1  presence of another person in the photograph.   Thus, when looking at the totality of the

2  circumstances, the photographic identifications of Petitioner were not impermissibly suggestive.

3  The identifications of Petitioner by Gaynor and Franco were reliable, because both

4  Gaynor and Franco were in close proximity to the suspects and had consistently described the

5  third suspect as having red-tipped dreadlocks.   Both Gaynor and Franco were unwavering in

6  their identifications of Petitioner at the time of the photographic identifications.   Therefore, a

7  motion to challenge the out-of-court identifications of Petitioner by Franco and Gaynor would

8  have been unsuccessful, and it was reasonable for Petitioner's trial counsel to not bring a

9  suppression motion.   See Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005) (holding that

10 failure to bring a futile motion does not constitute ineffective assistance of counsel).

11 In addition, Petitioner has not shown that the failure of his trial counsel to challenge the

12 out-of-court identifications resulted in prejudice that would have caused the result of the trial to

13 be different.   There was an abundance of other evidence identifying Petitioner as a participant in

14 the robberies.   Although Petitioner argues that Thompson exonerated Petitioner, Thompson

15 actually inferentially implicated Petitioner.   In the beginning of Thompson's testimony he

16 contended that two different men were the third suspects in the robberies.   However, Thompson

17 eventually testified that the same person was involved in both the Franco and Gaynor robberies.

18 Thompson admitted that he was related to Petitioner, had known Petitioner all of his life, and did

19 not want Petitioner to get into trouble.   He also testified that he was not willing to implicate

20 Petitioner because he knew that Petitioner had not implicated himself.   Gaynor also identified

21 Petitioner in court as one of the suspects involved in the robbery.   Petitioner's counsel cross-

22 examined both of the victims about their identifications of Petitioner, and the jury made a

23 credibility decision about the identifications.   Therefore, there was other identification evidence

24 adduced at trial.   Even if the jury was not presented with the out-of-court identifications of

25 Petitioner by Franco and Gaynor, there is not a reasonable probability that the result of the trial

26 would have been different.   Therefore, Petitioner has not demonstrated that the state court's

27 denial of his ineffective assistance of counsel claim was contrary to or an unreasonable

28 application of clearly established federal law.   28 U.S.C. § 2254(d)(1).

2. Bifurcation of the gang evidence

Petitioner also argues that the trial court abused its discretion when it denied Petitioner's pretrial motion to sever the substantive gang offense in count IV (Cal. Penal Code § 186.22(a)), and bifurcate the gang enhancements (Cal. Penal Code § 186.22(b)(1)) from the robbery charges. The California Court of Appeal rejected this argument:

> **I. *Denial of severance/bifurcation motions on gang allegations and evidence***
>
> Thompson and Easter contend the court abused its discretion when it denied their pretrial motion to sever count IV, the substantive gang offense (§ 186.22, subd. (a)), and bifurcate the gang enhancements (§ 186.22, subd. (b)(1)), from the three robbery charges. Defendants argue the gang evidence was irrelevant and prejudicial to the robbery charges because there was no evidence the suspects committed the robberies to benefit any gang.
>
> **A. *Background***
>
> Prior to trial, Easter moved to bifurcate the robbery charges from count IV, the gang substantive offense, and the gang enhancements; Thompson and Williams joined the motion. They argued the gang evidence was irrelevant and prejudicial to the robbery charges. The prosecutor replied the gang evidence was relevant to prove that defendants intended to aid and abet each other in the commission of the robberies, particularly during the Gaynor robbery. The prosecutor also cited to the "bathroom" video which showed all three defendants talking about the Playboyz gang, and throwing gang signs, while Thompson held the gun which appeared to have been used in the robberies.
>
> The trial court denied defendants' bifurcation motion:
>
> "[T]he court does not find the inclusion of the gang enhancement or the gang charge is such that it will unduly prejudice the defendants in their ability to receive a fair trial. It does not show any extraordinary prejudice in this Court's mind. So the motion to bifurcate is denied. Because in essence what counsel is asking is not just for a bifurcation of the enhancements but for a severance of [count IV]. Because in essence it would be virtually impossible for counsel or for the Court to adequately explore the minds of potential jurors in this case concerning gangs during voir dire if the same jury was going to ultimately hear evidence on an enhancement and the gang count separate from the underlying charges. We couldn't do that. We would have to have basically a new jury which would allow counsel and the Court to explore those attitudes.
>
> "Because by simply taking what [Williams's attorney] said, by simply mentioning gangs in the context of a jury trial, that doesn't have any information concerning gangs, at least so far as the jury is concerned. They wouldn't know what is going on in this case. They would suspect but they would not know. It will cause them to

speculate, in other words, if we were to start asking them questions about an enhancement, or charges or associations without there being any charges or enhancements in the case to begin with.

"The Court is satisfied that the jurors—and the law recognizes that the jurors will do their responsibility and will follow the law. They will be informed as to any evidence concerning gang affiliation or gang conduct would be admitted for the sole purpose of determining whether the allegations are true concerning the enhancement and the charge, but they are not to consider that concerning the underlying robbery charges, only the gang charges. So the request to bifurcate is denied."

**B. *Bifurcation***

A trial court has broad discretion to control the conduct of a criminal trial, including the power to bifurcate a gang enhancement from trial on the substantive charges. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048 (*Hernandez*).) However, the need to bifurcate gang allegations is often not as compelling as for the bifurcation of prior conviction evidence. (*Id.* at pp. 1048–1049.) "A prior conviction allegation relates to the defendant's *status* and may have no connection to the charged offense; by contrast, the criminal street gang enhancement is attached to the charged offense and is, by definition, inextricably intertwined with that offense. So less need for bifurcation generally exists with the gang enhancement than with a prior conviction allegation. [Citation.]" (*Id.* at p. 1048, original italics.)

In moving for bifurcation, the defense must " 'clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' [Citation.]" (*Hernandez, supra,* 33 Cal.4th at p. 1051.) Bifurcation may be necessary where the predicate offenses offered to establish the pattern of criminal activity are "unduly prejudicial," or where some of the other gang evidence may be "so extraordinarily prejudicial, and of so little relevance to guilt," that it may influence the jury to convict regardless of the defendant's guilt. (*Id.* at p. 1049.) We review the trial court's denial of a motion to bifurcate for abuse of discretion. (*Id.* at p. 1048.)

**C. *Severance***

Joint trials of offenses which occur together are legislatively preferred over separate trials, and the party requesting severance of properly joined offenses has the burden to "clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried. [Citations.]" (*People v. Bean* (1988) 46 Cal.3d 919, 938–939; *Burnell, supra,* 132 Cal.App.4th at p. 946; see § 954.)

"In the context of severing charged offenses, we have explained that 'additional factors favor joinder. Trial of the counts together ordinarily avoids the increased expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate trials.' [Citation.] Accordingly, when the evidence sought to be severed relates to a charged offense, the 'burden is on the party seeking severance to clearly establish that there is a

substantial danger of prejudice requiring that the charges be separately tried. [Citations.]" (*Hernandez, supra,* 33 Cal.4th at p. 1050.)

As with bifurcation, the court's ruling on a severance motion is reviewed for abuse of discretion. (*People v. Marshall* (1997) 15 Cal.4th 1, 27–28.) "Whether a trial court abused its discretion in denying a motion to sever necessarily depends upon the particular circumstances of each case. [Citations.] The pertinent factors are these: (1) would the evidence of the crimes be cross-admissible in separate trials; (2) are some of the charges unusually likely to inflame the jury against the defendant; (3) has a weak case been joined with a strong case or another weak case so that the total evidence on the joined charges may alter the outcome of some or all of the charged offenses; and (4) is any one of the charges a death penalty offense, or does joinder of the charges convert the matter into a capital case. [Citation.] A determination that the evidence was cross-admissible ordinarily dispels any inference of prejudice. [Citations.]" (*Ibid.*)

**D. *The court did not abuse its discretion***
The trial court did not abuse its discretion when it denied defendants' motions for severance and bifurcation of the gang allegations and evidence in this case. The gang evidence was necessarily intertwined with the charged offenses as to several relevant issues, particularly aiding and abetting, identity, and bias. As we will discuss in issue IV, *post,* one of the key issues in the Gaynor robbery was the culpability of Williams and Easter, who stood by while Thompson pulled the gun and went through Gaynor's pockets. Their joint gang status was clearly relevant as circumstantial evidence of their intent and knowledge to prove aiding and abetting to commit robbery. (See, e.g., *Burnell, supra,* 132 Cal.App.4th 938, 947; *People v. Salgado* (2001) 88 Cal.App.4th 5, 15–16; *In re Jose T.* (1991) 230 Cal.App.3d 1455, 1460–1461.)

In addition, the defendants' common gang membership was relevant and admissible as to identity, bias, and impeachment. In his postarrest statement, Williams said that "Alex" and not Easter was the gunman for the Franco robbery. At trial, Thompson refused to identify the third suspect in the Franco and Gaynor robberies, and gave equivocal testimony about whether Easter was that man. For example, in *People v. Ruiz* (1998) 62 Cal.App.4th 234, the defendant was charged with selling drugs to an undercover officer. The defendant argued that a third party was guilty of the offense, based on that person's alleged confession to a defense investigator. *Ruiz* held the trial court properly permitted the prosecution to introduce evidence that the defendant and the third party were members of the same gang and likely knew each other, because the evidence was relevant for impeachment and bias. (*Id.* at pp. 240–243.)

As relevant to the charges in this case, "to entirely eliminate the gang evidence would have required a severance ... of the street terrorism count and the bifurcation of the gang enhancements."

34

(*Burnell, supra,* 132 Cal.App.4th at p 947.) Defendants failed to carry their burden to clearly establish that there was a substantial danger of prejudice requiring that the charges be separately tried for severance. The gang evidence was cross-admissible as to aiding and abetting, identity, and bias of the witnesses. The substantive gang charge required much the same evidence to prove, and was no more potentially inflammatory than the other charges, such that severance would not have been appropriate. (See, e.g., *Hernandez, supra,* 33 Cal.4th at p. 1051.) In addition, the jury was correctly instructed on the limited purpose of gang evidence, including the limited admissibility of the two videos. (CALCRIM NO. 1403.) We presume the jury followed the instructions. (Cf. *Hernandez, supra,* 33 Cal.4th at pp. 1052–1053.)

**E. *Due process***

Finally, Thompson argues the denial of his motions for bifurcation and/or severance violated his due process right to a fair trial on the robbery charges, because of the alleged "gross unfairness" that resulted from the introduction of the gang evidence in this case. Thompson's argument is based on *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran* ), which held:

"To prove a deprivation of federal due process rights, [the defendant] must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial. 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citation.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.] 'The dispositive issue is ... whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." [Citations.]' [Citation.]" (*Id.* at pp. 229–230, fn. omitted.)

However, *Albarran* dealt with a factual scenario that was different from this case. In *Albarran,* the defendant was charged with multiple offenses based on his participation in a shooting at the victim's home. He was not charged with the gang substantive offense, but gang enhancements were alleged. The trial court permitted the prosecution to introduce gang evidence to prove the defendant's motive and intent. The jury convicted the defendant of the substantive offenses and found the gang enhancements were true. Thereafter, the trial court granted defendant's posttrial motion and dismissed the gang allegations for insufficient evidence. (*Albarran, supra,* 149 Cal.App.4th at pp. 217–222.)

*Albarran* held that while the trial court may have initially found that the defendant's gang activities were relevant and probative to his motive and intent, the court abused its discretion when it permitted the prosecution to introduce additional gang evidence that was irrelevant to the defendant's motive or the substantive criminal charges. (*Albarran, supra,* 149 Cal.App.4th at p. 217.) The irrelevant evidence included other gang members' threats to kill police officers, and references to the Mexican Mafia prison

gang. *Albarran* characterized the irrelevant gang evidence as "overkill," (*id.* at p. 228, fn. omitted) and "extremely and uniquely inflammatory, such that the prejudice arising from the jury's exposure to it could only have served to cloud their resolution of the issues." (*Id.* at p. 230, fn. omitted.) *Albarran* found the gang evidence was so inflammatory that it "had no legitimate purpose in this trial," and held admission of that evidence violated defendant's due process rights. (*Id.* at pp. 230–231.)

In contrast to *Albarran,* the instant case is not "one of those rare and unusual occasions where the admission of evidence has violated federal due process and rendered the defendant's trial fundamentally unfair." (*Albarran, supra,* 149 Cal.App.4th at p. 232.) The defendants in this case were charged with both the gang substantive offense and enhancements. The trial court did not grant a posttrial motion to dismiss either count IV or the enhancements. As we have explained, the jury was properly instructed on the limited admissibility of the gang evidence. As we will also explain in issues II and III, *post,* the jury's findings on the gang substantive offense and enhancements are supported by substantial evidence.

More importantly, Officer Flowers's expert testimony regarding the criminal activities of the Playboyz was not similar to the sensational and prejudicial testimony admitted in *Albarran.* While Flowers addressed predicate offenses committed by other members of the Playboyz, his testimony was limited to the essential facts which the prosecution was required to prove for the elements of both the gang substantive offense and the enhancements. The gang evidence in this case was no more sensational than the evidence as to the three Craigslist armed robberies committed against the victims in this case. The court did not abuse its discretion when it denied bifurcation and severance of the gang allegations, and the admission of the gang evidence did not violate defendant's due process rights.

(LD 5 at 14-18).

The United States Supreme Court has never issued a ruling on the issue that Petitioner raises in this claim, although it has expressly declined to require bifurcation in a criminal jury trial when the prosecutor seeks to admit evidence of defendant's prior convictions during the trial to prove a sentence enhancement charge under a recidivist statute.  See Spencer v. Texas, 385 U.S. 554, 565-66 (1967).  Therefore, there is no clearly established Supreme Court precedent, and Petitioner cannot argue that the state court acted contrary to clearly established Supreme Court precedent.  Moreover, federal courts cannot conduct a "finely tuned review of the wisdom of state evidentiary rules."  Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983).

Nevertheless, Respondent argues that the trial court's decision not to sever the

36

substantive gang offense and bifurcate the gang enhancement allegations did not render Petitioner's trial fundamentally unfair.   Respondent argues that the gang evidence was intertwined with the charged offenses as to several relevant issues, particularly mental state, identity, and bias, so that severance and bifurcation were not necessary.

Petitioner must demonstrate that the trial court's decision not to sever and bifurcate rendered the state trial fundamentally unfair in order to establish a constitutional violation warranting habeas relief.  See Featherstone v. Estelle, 948 F.2d 1497, 1503 (9th Cir. 1991).  It was reasonable for the state court to find that one of the key issues in the Gaynor robbery was the culpability of Williams and Petitioner, and therefore, the joint gang status was clearly relevant to prove that they had aided and abetted the robbery.  It was also reasonable for the state court to find that the defendants' common gang membership in the Playboyz was relevant and admissible to impeach Williams's post arrest statement in which he claimed a third party was the gunman in the Franco robbery.  The gang evidence was also relevant to establish Petitioner's identity as the third suspect in the Franco robbery.  Therefore, the gang evidence was cross admissible, and Petitioner has not established that the trial court's decision to not sever the substantive gang offense and bifurcate the gang enhancements rendered his trial fundamentally unfair in violation of his due process rights.  In addition, Petitioner has not established prejudice, as the evidence of membership in the Playboyz was not highly prejudicial or inflammatory in light of the nature of the charges.  Therefore, this claim must be denied.

3. Claims raised in Traverse

In Petitioner's traverse, he appears to raise an argument that there was insufficient evidence to convict him of the crimes which he was convicted of.  Although Petitioner may have just raised this claim in the context of the prejudice prong for his ineffective assistance of counsel claim, this Court will liberally construe Petitioner's filing and address it as a separate claim raised in the traverse.  To the extent Petitioner is attempting to belatedly raise new claims in the traverse, relief must be denied, because it is improper to raise new claims in a traverse. See Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994); Greenwood v. Fed. Aviation Admin., 28 F.3d 971, 977 (9th Cir. 1994); Rule 2(c)(1) of Rules Governing Section 2254 Cases.

# IV.

## CERTIFICATE OF APPEALABILITY

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003).   The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c) (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–
>
>> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>>
>> (B) the final order in a proceeding under section 2255.
>
> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
>
> (3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473, 484 (2000).   While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on

his . . . part." <u>Miller-El</u>, 537 U.S. at 338.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further.  Petitioner has not made the required substantial showing of the denial of a constitutional right.  Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

## V.

## ORDER

Accordingly, this Court hereby ORDERS that:

1) The Petition for Writ of Habeas Corpus is DENIED;

2) The Clerk of Court is DIRECTED to enter judgment for Respondent and close the case; and

3) The Court declines to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:   **January 29, 2015**

UNITED STATES MAGISTRATE JUDGE